699 S.E.2d 715

**Jean HOLST, Individually and as Personal Representative of the Estate of William Edward Holst, Jr., Appellant,**

**v.**

**KCI KONECRANES INTERNATIONAL CORPORATION a/k/a Konecranes Inc., KCI Special Cranes Corporation f/k/a KCI Konecranes VLC, and South Carolina State Port Authority a/k/a SCSPA, Defendants**

**Of Whom KCI Konecranes International Corporation a/k/a Konecranes Inc. and KCI Special Cranes Corporation f/k/a KCI Konecranes VLC are the Respondents.**

No. 4736.

Court of Appeals of South Carolina.

Heard April 14, 2010.
Decided Sept. 8, 2010.

30

32

Anne McGuinness Kearse, Kevin R. Dean, and T. David Hoyle, all of Mount Pleasant, for Appellant.

Stephen E. Darling, of Charleston, for Respondents.

LOCKEMY, J.

Jean Holst argues the circuit court erred in granting KCI Konecranes International Corporation a/k/a Konecranes, Inc. and KCI Special Cranes Corporation f/k/a KCI Konecranes VLC's (collectively, KCI) motion for summary judgment. Specifically, she maintains the circuit court erred in (1) improperly weighing evidence; (2) applying the improper legal standard regarding the role of industry custom; (3) applying legal standards from *Sexton By & Through Sexton v. Bell Helmets, Inc.*, 926 F.2d 331 (4th Cir.1991), *Marchant v. Mitchell Distributing Co.*, 270 S.C. 29, 240 S.E.2d 511 (1977), and *Bragg v. Hi–Ranger, Inc.*, 319 S.C. 531, 462 S.E.2d 321 (Ct.App.1995); and (4) granting summary judgment on her strict liability, negligence, and failure to warn causes of action. We affirm.

## FACTS

William Holst was a checker at the Wando Welch Terminal of the South Carolina State Ports Authority (SCSPA) in Charleston. As a checker, Holst was responsible for identifying the containers needed for transport between the container yard and the ships. After identifying the correct containers for transport, Holst would instruct the crane operators to move and load the containers in the proper sequence. On July 5, 2004, Holst was working with Chad Swan, an employee of the SCSPA, who operated a KCI rubber-tired gantry crane (the crane). Swan was transferring containers from a container pad onto trucks for transport.[1] Holst instructed Swan to move all of the containers in stacks two, three, and four of the

---

1. A container pad contains a truck lane and six stacks of containers, each with the potential of having four containers stacked on top of each other.

pad. After Swan moved all of the containers out of stack two, he picked up the four containers from stack one and lowered them into stack two. Holst was standing in stack two and was crushed to death by the containers.

Swan testified he was unaware Holst was in the second stack when he grounded the containers from stack one. He further testified he did not have visibility of the ground in stack two from the operator's cab of the crane. Swan stated that while Holst did not instruct him to move the containers from stack one into stack two, it was protocol and a safety procedure to move the four containers out of stack one.

The crane was designed and manufactured by KCI Konecranes VLC Corporation, a Finnish company, and was purchased by the SCSPA in 1997. The crane was built according to the SCSPA's specifications and shipped to Charleston for erection. The SCSPA maintained the crane, and it was inspected by an independent consulting firm during its operation. The crane's operator's cab was designed to have as much glass as possible to increase visibility for the crane operator.

On February 18, 2005, Jean Holst, individually and as personal representative of the Estate of William Edward Holst, Jr., filed suit alleging negligence, breach of warranty, and strict liability for defective design against KCI.[2] On May 8, 2008, KCI filed a motion for summary judgment. KCI asserted there were no genuine issues of material fact as to the claimed defective and unreasonably dangerous condition of the crane. KCI also asserted additional grounds for summary judgment including comparative negligence and assumption of the risk. Holst maintained the crane was defectively designed because of visibility limitations from the operator's cab. Furthermore, Holst proposed mounting a closed-circuit video camera on the edge of the crane's trolley as a feasible design alternative to increase the operator's visibility. Holst also argued KCI failed to warn crane users about the crane's sight limitations.

---

2. Holst filed suit against Konecranes International Corporation a/k/a Konecranes, Inc. and the SCSPA. In November 2005, Holst amended her complaint to add KCI Special Cranes Corporation f/k/a KCI Konecranes VLC as a defendant.

The circuit court granted summary judgment, and determined Holst's defective design and failure to warn claims failed as a matter of law. The circuit court found there was no competent evidence the crane was negligently designed or that the crane's design did not meet consumer expectation or social utility tests. Furthermore, the circuit court concluded that Holst failed to present competent evidence that the warnings supplied by KCI were inadequate. The circuit court also noted Holst's proposed alternative design was not mandated, was not used on any rubber-tired gantry (RTG) crane operating in the world, and its absence did not make the crane unreasonably dangerous for its intended use. The circuit court did not address KCI's additional grounds for summary judgment. This appeal followed.

## STANDARD OF REVIEW

When reviewing the grant of a summary judgment motion, the appellate court applies the same standard of review as the trial court under Rule 56(c), SCRCP. *Companion Prop. & Cas. Ins. Co. v. Airborne Exp., Inc.*, 369 S.C. 388, 390, 631 S.E.2d 915, 916 (Ct.App.2006). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Wilson v. Moseley*, 327 S.C. 144, 146, 488 S.E.2d 862, 863 (1997). In ruling on a motion for summary judgment, the evidence and all inferences which can be reasonably drawn therefrom must be viewed in the light most favorable to the non-moving party. *Id.*

## LAW/ANALYSIS

### I. Weighing the Evidence

Holst argues the circuit court erred in weighing the evidence instead of finding that material questions of fact existed. Specifically, Holst maintains the circuit court improperly weighed conflicting testimony (1) as to whether the crane was defective and unreasonably dangerous, (2) as to whether the crane complied with applicable standards, and (3) comparing the crane to other cranes on the market. We disagree.

## A. Expert Testimony

In a product liability action under both negligence and strict liability theories, the plaintiff must establish "(1) that he was injured by the product; (2) that the product, at the time of the accident, was in essentially the same condition as when it left the hands of the defendant; and (3) that the injury occurred because the product was in a defective condition unreasonably dangerous to the user." *Allen v. Long Mfg. NC, Inc.*, 332 S.C. 422, 426, 505 S.E.2d 354, 356 (Ct.App.1998). Furthermore, "to survive summary judgment, it is crucial that a plaintiff also demonstrate that a feasible, or workable, design alternative exists under the circumstances." *Disher v. Synthes (U.S.A.)*, 371 F.Supp.2d 764, 771 (D.S.C.2005). "In determining whether an alternative design is practical or feasible, courts will look to see whether a risk-utility analysis has been conducted to weigh the benefits of any new design against the costs and potentially adverse consequences of the design." *Id.* at 771–72.

In support of her allegation that the crane was defectively designed, Holst relied on the opinions of two engineering experts. Dr. George Pearsall testified the crane was "unreasonably dangerous because the operator did not have an obstruction free visibility to see if anyone was below the load block even shortly before he dropped the load." Richard Leonard testified crane operators should have sight of the areas they are working over, and that it was feasible to mount a closed-circuit video camera on the crane's trolley to improve visibility. Furthermore, Pearsall concluded that if the crane had been equipped with a camera it would have been "much more likely that the operator would have seen Mr. Holst there and certainly would not have dropped the container on him." While Pearsall and Leonard both concluded that video cameras would increase visibility from the operator's cab, they conceded cameras would not eliminate the crane's blind spot. Pearsall and Leonard also admitted they knew of no other manufacturers that installed cameras on RTG crane trolleys, and they agreed the crane met industry standards and regulations. Leonard also testified he had never seen an RTG crane operator's cab with greater visibility than the crane's cab.

We find the testimony offered by Holst's experts was not sufficient to prove the crane was defective and unreasonably dangerous. Neither Pearsall nor Leonard conducted a risk-utility analysis regarding their proposed design alternative. Not only did Pearsall and Leonard testify the proposed camera design would not eliminate the blind spot, they also failed to weigh the benefits of installing cameras against the costs and potentially adverse consequences. Moreover, Arun Bhimani and Allen Palmer, KCI's engineering experts, concluded the presence of video camera monitors in the crane operator's cab could distract operators and create a hazard. Because Holst failed to produce evidence of a feasible design alternative or that a risk-utility analysis was conducted, she cannot establish the crane was defective and unreasonably dangerous as a matter of law.

### B. Applicable Standards

■ Holst contends the circuit court improperly weighed evidence when it determined KCI complied with the American Society of Mechanical Engineers (ASME) B30.2–1.5.1(b) standard. ASME B30.2–1.5.1(b) provides:

> The arrangement of the cab should allow the operator a full view of the load block in all positions. This is an important and desirable condition, but it is recognized that there are physical arrangements that may make this impossible, and, when the load block is in these positions, the operator shall be aided by other means such as, but not limited to, closed-circuit TV, mirrors, radio, telephone or a signalperson.

The circuit court determined KCI complied with this standard, and noted the crane's operator's cab was surrounded in glass and positioned below steel structures to give the operator an enhanced view. Furthermore, the circuit court found the operator had a full view of the load block in all positions.[3] The circuit court noted that even assuming the load block was not visible, at least three other means were provided to aid the operator. Swan had access to a telephone, an intercom with a loudspeaker, and a two-way radio.

---

3. The "load block" is the wires, hook, and spreader bar which attach to the top of the containers.

■ Holst also argues the crane did not comply with International Organization for Standardization (ISO) standards. Section 8566–1 of the ISO requires that crane operator cabs have "maximum visibility consistent with structural requirements and operational safety." Additionally, the ISO standards require cabs be "placed and the size and the location of the window openings so chosen as to allow the driver supervision of loading and of loads transfer operations from his seat. For some cranes this may necessitate provisions for moving or rotating the cab or other means." Here, while a blind spot prevented the crane operator from seeing the ground while lowering the containers, the operator had "other means" which allowed him to supervise the loading and transfer. The crane was equipped with a two-way radio, telephone, and intercom which allowed Swan to communicate with Holst. Thus, the circuit court did not err in finding KCI complied with applicable safety standards.

## C. Other Cranes on the Market

■ Finally, Holst maintains the circuit court erred in improperly weighing the testimony comparing the crane to other cranes on the market. The circuit court determined "the uncontradicted testimony is that no crane on the market had better visibility from the operator's cab" than KCI's crane. Holst maintains Mi–Jack, another RTG crane manufacturer, produces a crane with a "variable elevating cabin" that moves up and down along the side of the crane instead of left and right on the trolley at the top of the crane. Holst notes Palmer testified that "in limited conditions" an operator in a cab that could move up and down "may have better visibility" than the operator of a cab that is fixed at the top of the trolley.

Leonard testified he had never seen an RTG operator's cab with greater visibility than the crane's cab. Furthermore, Holst failed to present evidence of how the Mi–Jack design would prove the design of the crane was defective. While Palmer testified the Mi–Jack crane "may have better visibility" in certain circumstances, the record does not contain any evidence that the Mi–Jack design eliminated the crane's blind spot. Moreover, Holst failed to provide evidence the Mi–Jack crane was similar enough to the crane to warrant a compari-

son. Accordingly, we find the circuit court did not improperly weigh testimony in determining the evidence in the record was insufficient to sustain Holst's claim that the crane was defective and unreasonably dangerous.

## II. Industry Custom

██ Holst argues the circuit court erred in applying the wrong legal standard regarding industry custom in negligence and strict liability tort cases. Specifically, Holst alleges the circuit court based its grant of summary judgment on the crane's conformity with industry custom. We disagree.

The circuit court found a determination of whether or not a product was defective and unreasonably dangerous involved

a balancing act to consider whether (1) the product sold must be dangerous to an extent beyond that which would be contemplated by the ordinary user who purchases it ("consumer expectation test") and (2) the danger associated with the use of the product outweighs the utility of the product ("social utility test").

(citing *Bray v. Marathon Corp.*, 356 S.C. 111, 588 S.E.2d 93 (2003); *Bragg*, 319 S.C. at 544, 462 S.E.2d at 329). In its application of these tests, the circuit court considered industry standards and practices, the warnings provided by KCI, the operator cab's design compared to other cranes on the market, and the feasibility and utility of installing video cameras on the crane.

While the circuit court considered industry custom in determining Holst failed to produce competent evidence that the crane was defective and unreasonably dangerous, it was only one factor considered by the court. Because this court has given weight to conformity with industry custom, we find the circuit court did not err in considering conformity with industry custom as one factor in its analysis. *See Bragg*, 319 S.C. at 544, 462 S.E.2d at 329 ("While conformity with industry practice is not conclusive of the product's safety, the cases where a member of industry will be held liable for failing to do what no one in his position has ever done before will be infrequent.").

### III. Court Cases

Holst argues the circuit court erred in applying inapplicable legal standards from *Bell Helmets*, 926 F.2d 331, *Mitchell Distributing Co.*, 270 S.C. 29, 240 S.E.2d 511, and *Bragg*, 319 S.C. 531, 462 S.E.2d 321. We disagree.

In *Bell Helmets*, the Fourth Circuit Court of Appeals held the testimony of the plaintiff's expert in a Kentucky products liability case did not establish a defect, and therefore, the expert's testimony should not have been considered by the jury. 926 F.2d at 338. The expert in *Bell Helmets* proposed a design alternative for the subject helmet that would accommodate high and low impact accidents. *Id.* at 335. In making its ruling, the Fourth Circuit considered evidence that no other manufacturer in the industry had designed or manufactured a helmet like the expert's prototype helmet, and that the subject helmet conformed to industry standards. *Id.* at 333, 335. Holst argues the circuit court erred in relying on *Bell Helmets* because of Kentucky's rebuttable presumption statute. We disagree. The rebuttable presumption statute was not considered by the Fourth Circuit in its determination that the expert's testimony was insufficient for submission to the jury. In fact, the Fourth Circuit expressed its "puzzlement" over the need for a statute, and found the lower court did not err in failing to submit the statute to the jury because a defendant always carries a presumption in his favor when the burden of proof is placed on the plaintiff. *Id.* at 333.

Holst also contends the circuit court erred in relying on *Mitchell.* In *Mitchell*, our supreme court affirmed the lower court's grant of summary judgment in favor of a crane's distributor on the basis that the subject crane was not defective. 270 S.C. at 35–36, 240 S.E.2d at 513–14. In concluding the plaintiff offered insufficient evidence to establish a defect, the supreme court noted the absence of an optional safety device does not render a product defective unless the product is unreasonably dangerous without the device. *Id.* Holst argues that because KCI designed and manufactured the crane, *Marchant v. Lorain Division of Koehring (Marchant II)*, 272 S.C. 243, 251 S.E.2d 189 (1979), not *Mitchell*, provides the applicable standard. In *Marchant II*, our supreme court reversed the trial court's grant of summary judgment against

a crane manufacturer where there was evidence the manufacturer knew of the crane's tendency to double-block, and the manufacturer sold an optional anti-two blocking device. 272 S.C. at 245, 251 S.E.2d at 191. The court noted the affidavit of a design engineer was sufficient evidence to create a jury issue regarding whether the crane was unreasonably dangerous without the incorporation of a safety device. *Id.* at 247, 251 S.E.2d at 191–92. The design engineer stated that the two-blocking syndrome was predictable based on the crane's design. *Id.* Here, unlike in *Marchant II* where the crane's tendency to malfunction was documented, the evidence indicates that no such incident like the one which occurred in this case had ever occurred. Furthermore, in *Marchant II,* the manufacturer sold an optional safety device; while in this case, the video camera alternative proposed by Holst has never been used on a RTG crane. Moreover, evidence in the record establishes that the proposed video camera would not eliminate the crane's blind spot. Thus, viewing this case under the holding in *Marchant II,* we find Holst is not entitled to relief.

Holst also argues the circuit court erred in relying on dicta in *Bragg* to support the proposition that conformity with industry custom is an appropriate basis for granting summary judgment. In *Bragg,* the court considered the plaintiff's expert's testimony that no one in the industry had designed or manufactured the type of special disconnect couplings he proposed. 319 S.C. at 544, 462 S.E.2d at 329. The court affirmed the directed verdict and held that "conformity with industry practice is not conclusive of the product's safety," and "industry standards are relevant to show both the reasonableness of the design and that the product is dangerous beyond the expectations of the ordinary consumer." *Id.* at 543–44, 462 S.E.2d at 328–29. We find the court's holding in *Bragg* was not dicta because conformity with industry custom was an issue before the court. See *Nash v. Tindall Corp.,* 375 S.C. 36, 40, 650 S.E.2d 81, 83 (Ct.App.2007) (holding dicta is a statement on a matter not necessarily involved in the case). Moreover, in the present case, the circuit court did not rely solely on conformity with industry custom in determining there was no competent evidence by which a reasonable jury could conclude the crane was defective. Conformity with

industry custom was only one factor the circuit court considered in reaching its decision. Thus, the circuit court did not err in relying on *Bragg*.

### IV. Summary Judgment

Holst argues the circuit court erred in granting summary judgment on her strict liability and negligence claims for defective design, and her negligence claim for failure to warn. We disagree.

### A. Strict Liability

Holst contends the circuit court improperly granted summary judgment on her strict liability claim because Pearsall and Leonard testified the crane was defective and unreasonably dangerous. As discussed above, we find the circuit court properly determined KCI was entitled to summary judgment on Holst's strict liability claim.

### B. Negligence—Defective Design

Holst argues genuine issues of material fact exist as to whether KCI exercised due care in designing the crane. "Under a negligence theory, the plaintiff bears the additional burden of demonstrating the defendant (seller or manufacturer) failed to exercise due care in some respect, and, unlike strict liability, the focus is on the conduct of the seller or manufacturer, and liability is determined according to fault." *Bragg*, 319 S.C. at 539, 462 S.E.2d at 326. Holst contends KCI did not consider (1) installing video cameras on its cranes, (2) placing the cab on any part of the crane other than the trolley, or (3) the "variable elevating cabin" manufactured by Mi–Jack.

We find Holst failed to present a material question of fact as to whether KCI exercised due care in designing the crane. Evidence in the record indicates KCI designed a crane cab which, compared to its competitors, greatly increased the crane operator's visibility. Pursuant to requests from its users that KCI increase the visibility from the operator's cab, KCI minimized the areas of the cab that did not contain glass and increased the height of the crane. Ilpo Hakala, the KCI engineer who designed the crane, testified the crane's opera-

tor's cab had increased visibility compared to its competitors. Moreover, Leonard testified he had never seen a RTG cab with better visibility than the crane's cab.

While Holst contends KCI was negligent because it did not consider installing video cameras on the crane, the undisputed evidence in the record is that the crane's blind spot cannot be eliminated. Holst's experts testified that even with a video camera, the crane's blind spot is unavoidable. Additionally, the crane's design included safety measures which allowed the operator to communicate with personnel on the ground in compliance with the ASME standard. The crane's cab had a full view of the load block as required by the ASME, and was equipped with a telephone, horn, and intercom to allow the operator to communicate with personnel on the ground. Furthermore, although Holst argues KCI was negligent in failing to consider the variable-elevating cabin of the Mi–Jack, there is no evidence in the record the Mi–Jack design would eliminate the crane's blind spot. Finally, the mere fact that a video camera and closed-circuit television system could have been installed on the crane does not establish a design defect. *See Disher*, 371 F.Supp.2d at 770 (concluding every product on the market could be "made stronger" or "more safe," but the mere fact that the product could be stronger or safer does not establish a design defect or an unreasonably dangerous condition, as a matter of law).

## C. Negligence—Failure to Warn

 Holst also argues KCI was negligent in failing to warn users about the crane's blind spot. Holst argues KCI failed to conduct a formal training meeting with personnel from the SCSPA to disclose the crane's blind spots. Furthermore, Holst argues the crane's Operation and Maintenance Manual (Manual) does not mention the blind spot.

A supplier and manufacturer of a product are liable for failing to warn if they know or have reason to know the product is or is likely to be dangerous for its intended use; they have no reason to believe the user will realize the potential danger; and, they fail to exercise reasonable care to inform of its dangerous condition or of the facts which make it likely to be dangerous.

*Livingston v. Noland Corp.*, 293 S.C. 521, 525, 362 S.E.2d 16, 18 (1987).

We find Holst's negligence claim for failure to warn fails because the evidence in the record reflects KCI provided proper warnings regarding the crane. KCI warned SCSPA personnel and other users about the dangers of working under the crane's hanging load in its Manual and in warning decals posted on the crane. Hakala testified the Manual warned users to "stay clear of spreader when in operation" and "do not stand under suspended load." Furthermore, "Danger" and "Hanging Load" warning decals were located at eye-level on the crane, and labels on the spreader bar warned users to "Stay Clear of Spreader When in Operation" and "Do Not Stand Under Suspended Load." Bhimani testified these warnings met industry standards and were consistent with the practices of other crane manufacturers. Because the evidence presented established that KCI warned users against working under the crane's hanging load, Holst's negligence claim for failure to warn fails.

## CONCLUSION

Accordingly, the circuit court's grant of summary judgment is

**AFFIRMED.**

SHORT and WILLIAMS, JJ., concur.