749 S.E.2d 126

**Scott F. LAWING and Tammy R. Lawing, Appellants,**

**v.**

**TRINITY MANUFACTURING, INC., Matrix Outsourcing, LLC, and Univar, USA, Inc., Defendants,**

**of whom Trinity Manufacturing, Inc. and Matrix Outsourcing, LLC are Respondents.**

Appellate Case No. 2009–112467.

No. 5166.

Court of Appeals of South Carolina.

Heard June 12, 2013.

Decided Aug. 21, 2013.

Rehearing Denied Oct. 22, 2013.

14

John S. Nichols, Bluestein, Nichols, Thompson, & Delgado, LLC, of Columbia; Robert C. Foster, Foster & Foster, LLP, of Greenville; William P. Walker, Jr. and S. Kirkpatrick Morgan, Jr., Walker & Morgan, LLC, of Lexington; and Larry C. Brandt, of Walhalla, for Appellants.

Christian Stegmaier, Collins & Lacy, PC, of Columbia; Amy Lynn Neuschafer, Collins & Lacy, PC, of Murrells Inlet; Ellis M. Johnston, II and Joshua L. Howard, both of Haynsworth Sinkler Boyd, PA, of Greenville; and Gray Thomas Culbreath, Gallivan, White & Boyd, PA, of Columbia, for Respondents.

FEW, C.J.

Scott Lawing suffered severe burns over almost half his body when a large amount of a highly-flammable chemical caught fire at his jobsite. He brought a products liability lawsuit against several entities in the supply chain for the chemical. After a six-week jury trial, the trial court awarded substantial damages to Lawing and two of his co-workers. Lawing nevertheless appeals, arguing the trial court made two erroneous rulings. First, Lawing contends the court erred in

finding he was not a "user" of the chemical and granting summary judgment against him on his strict liability claim. Second, he contends the court should not have charged the jury on the sophisticated user doctrine. We affirm the trial court's decision to charge the sophisticated user doctrine, but reverse the decision to grant summary judgment because we find the trial court employed too restrictive a definition of the term "user." We remand for a new trial on Lawing's strict liability claim.

## I. Facts

Engelhard Corporation was a world leader in refining precious metals. Before Engelhard was purchased in 2006, Engelhard operated a 400,000 square-foot facility in Seneca, where it produced a precious metal catalyst for use in the automobile industry and reclaimed precious metals from recycled materials.[1] Engelhard's refining processes involved the use of sodium bromate, which is an oxidizer. When heated to 700 degrees Fahrenheit, sodium bromate releases oxygen, which increases combustion in an existing fire. Engelhard was using approximately 132 tons of sodium bromate per year in its refining operations at the time of this accident.

Beginning in 2002, Engelhard bought sodium bromate from Univar, USA, a chemical distribution company. In December 2003, Engelhard submitted a purchase order to Univar for 170 tons of sodium bromate to cover Engelhard's anticipated needs for 2004.

Univar ordered the sodium bromate from Trinity Manufacturing, a chemical manufacturer. Trinity did not make sodium bromate, so it contracted with its subsidiary, Matrix Outsourcing, to obtain the product. Matrix ordered the sodium bromate from a Chinese exporting company, which, in turn, bought the chemical from a manufacturer in that country.

The manufacturer packaged the sodium bromate in white plastic bags that held twenty-five kilograms each. The bags had printing on both sides. On one side, "PRODUCT: SODIUM BROMATE 99.7% MIN." appeared in black ink near the top. Other information appeared below that, including the

---

1. BASF Corporation now operates the facility.

product code; the gross weight, tare weight, and net weight; and "MADE IN CHINA." On the other side of the bags, the manufacturer printed the standard symbol for an oxidizing agent. The symbol is a yellow diamond with black outlines. Inside the diamond is a drawing of a flame on top of a line, followed by "OXIDIZING AGENT" and "5.1" in black ink. The United States Department of Transportation requires this symbol to be used in labeling oxidizers such as sodium bromate. *See* 49 C.F.R. § 172.426 (2003) (requiring "the OXIDIZER label must be as follows," with image of symbol, and "the background color on the OXIDIZER label must be yellow").

Someone in the Chinese portion of the supply chain stacked the bags onto wooden pallets and shrink-wrapped the bags onto the pallets. Each pallet contained thirty-six bags. The shipment involved in the accident consisted of twenty pallets.

The shipment traveled from China to the port in Charleston. From there, a trucking company delivered the shipment directly to Engelhard in February 2004. Upon the shipment's arrival at the facility, Engelhard inspected it. One of the Engelhard employees who unloaded the shipment testified that when he looked at the pallets, some had bags with black writing on them and others had bags with the oxidizer symbol. However, he testified, "we were able to determine the difference and notice that they were the same thing because they do say 'sodium bromate' on them." After inspection, Engelhard accepted the shipment, and its employees moved it to a storage area.

Matrix provided Engelhard a material safety data sheet (MSDS) for the sodium bromate. Among other things, the MSDS said, "DANGER! OXIDIZER. Contact with other material may cause fire," and sodium bromate "[m]ay accelerate burning if involved in a fire. Containers may explode with heat. Prolonged exposure to fire or heat by the material may result in explosion." The MSDS also instructed users not to store sodium bromate next to combustible materials and to keep it from contacting organic matter.

Engelhard was already aware of the dangers described in the MSDS. Engelhard employed between fifteen and twenty chemical engineers in its laboratory at the facility in Seneca.

One engineer testified he knew that sodium bromate, as an oxidizer, "was always dangerous." Another testified the engineers "knew [sodium bromate] would support combustion and was an oxidizer." In addition, Frank Lamson–Scribner, the facility's operations and production manager, was asked at trial whether anyone working in the facility realized there was a risk that the sodium bromate could cause a fire like the one that occurred. He testified, "I think there are people in the plant that knew what the sodium bromate did."

Engelhard used roughly 500 chemicals in its operations at the Seneca facility, including between five and ten different oxidizers. Lamson–Scribner testified that between fifty and seventy-five of those 500 chemicals were hazardous. To protect employees, Engelhard provided safety training on hazardous materials and hazard communications. It taught employees that an MSDS contains information about a chemical and instructed them to look up the MSDS if they had a safety concern. Employees could access copies of MSDSs using computers located in several areas of the facility. Engelhard also trained employees to recognize and understand labels and symbols on chemical containers. One of the labels covered in that training was the oxidizer symbol. Finally, Engelhard taught employees that oxidizers can be hazardous if exposed to combustion.

In May 2004, Engelhard moved several pallets of the sodium bromate out of storage to a staging area in a hallway near some of the refining machinery.

The following month, Engelhard shut down the facility to perform maintenance. Lawing, a maintenance worker, was part of a team assigned to replace a metal pipe suspended from the facility's ceiling in a pipe rack. To remove the old pipe, the team would have to cut it into pieces using a blowtorch. This would cause hot molten bits of metal to fall from the pipe as it was being cut. The pipe rack passed directly over the staging area where Engelhard had chosen to store the pallets.

At the time of the accident, Engelhard had adopted a written procedure requiring that before employees could do any maintenance work that could create an ignition source for combustible or flammable materials, an Engelhard permit

supervisor had to issue an internal "hot work" permit. One of the requirements for obtaining the permit was that immediately before the work was to begin, the supervisor of the work had to inspect the work area for the presence of any combustible materials. The procedure further required that "[a]ll such materials ... be removed to a safe location for the duration" of the project.

On the morning of June 1, 2004, Steve Knox, the leader of the pipe removal team, inspected the work area with Tim Wald, the permit supervisor. Knox noticed the pallets but did not know what was in the bags. Engelhard policy required that when an employee encountered a substance and did not know what it was, the employee was to contact a supervisor. Knox did not contact his supervisor about the bags. He saw black writing on the bags, but he did not look closely enough to read it. Knox knew what the oxidizer symbol meant. He did not see such a symbol on the bags, but he did not attempt to turn any of the bags over. No one removed the pallets from the work area, and Wald issued the hot work permit.

After Wald issued the permit, but before the team began working, Lawing looked at the pallets to see if there was "[a] label or something that told [him he] needed to move" them. He saw nothing on the bags indicating he should not work near them. Seeing nothing to cause concern and knowing Wald had already issued the permit, he thought the pallets "were fine." Lawing testified he knew what the oxidizer symbol meant and would have moved the bags out of the work area if had he seen the symbol.

The team began removing the pipe later that day. Lawing's job was to stand in the pipe rack and lower cut sections of the pipe down from the rack to another man in a lift. At one point, while the men were working near the pallets, Knox saw a "flash" on one of the pallets. Within two or three seconds, an "inferno" "erupted" from the pallets and shot up into the pipe rack. Lawing jumped from the rack to the lift but could not get away from the fire. The flames enveloped him, and he could feel fire go into his mouth. Lawing does not remember whether he jumped or fell from the lift, but the drop to the floor was over twenty feet. The impact shattered his heels, ankles, and four vertebrae. He also lacerated his head in the

fall. When he landed, he was still on fire. He testified, "I thought I was going to die. I thought I was dying."

The fire burned forty-two percent of Lawing's skin, including his face, ears, arms, and legs. It also burned his lungs. He needed approximately fifty stitches to close the lacerations on his head. He spent over a month in a hospital burn unit, undergoing skin grafts, orthopedic surgeries, and other treatments. Despite Lawing receiving over $1,000,000 in medical treatment, many of his injuries are permanent. In addition to causing severe disfigurement, the fire caused Lawing to develop asthma for which he will need medication for the rest of his life. He also has trouble seeing and will need medication for his eyes, which can no longer lubricate themselves and are very sensitive to light.

## II. Procedural History

Lawing and the other two workers injured in the accident filed products liability lawsuits against Univar, Trinity, and Matrix. Lawing asserted causes of action against all three defendants for negligence, strict liability, and breach of implied warranty of merchantability. In addition, he asserted a cause of action against Univar for breach of express warranties contained in Engelhard's purchase order.[2] Lawing asserted these causes of action under two theories: first, the defendants supplied the sodium bromate in bags that were in a defective and unreasonably dangerous condition because the bags were made of combustible material; and second, the defendants failed to adequately warn of the sodium bromate's "propensity ... to ignite explosively in the presence of the packaging materials used." [3]

After a lengthy period of discovery, the defendants filed a joint motion for summary judgment on Lawing's strict liability cause of action. They argued that under section 15–73–10 of

---

2. The purchase order provided that each package must be marked to comply with 29 C.F.R. § 1910.1200 (2003), which is an Occupational Safety and Health Administration hazard communication regulation, and with Department of Transportation labeling and packaging regulations.

3. Lawing's wife asserted a cause of action against all three defendants for loss of consortium.

the South Carolina Code (2005), only a "user" or a "consumer" of a product may recover on a claim for strict liability, and because Lawing was not using or consuming the sodium bromate when he was burned, he could not recover in strict liability. The trial court agreed and granted the motion.

The trial court consolidated Lawing's case with the two others, and then bifurcated the trial into liability and damages phases. In its jury charge in the liability phase, the trial court instructed the jury on the sophisticated user doctrine. The jury returned verdicts for all three plaintiffs on their claims against Univar for breach of express warranty. However, the jury returned defense verdicts on Lawing's other causes of action.[4]

Lawing filed a joint motion for judgment notwithstanding the verdict or a new trial. He argued the trial court should not have charged the jury on the sophisticated user doctrine and should not have granted the defendants summary judgment on his strict liability cause of action. The trial court denied the motion.

In the damages phase, where the plaintiffs proceeded only against Univar, the jury awarded $1,900,000 to Lawing and $100,000 to his wife. Lawing filed a motion for new trial additur. The trial court granted the motion and increased the award to $4,100,000. Mrs. Lawing also filed a similar motion, which the trial court denied.

The case initially came to this court as a cross-appeal: Univar filed a notice of appeal, and Lawing filed a notice of cross-appeal naming all three defendants as respondents. While the case was pending in this court, Univar settled with Lawing, leaving only Lawing's appeal against Trinity and Matrix.

## III. Charging the Sophisticated User Doctrine

Lawing makes several arguments in his challenge to the trial court's decision to charge the jury on the sophisticated user doctrine. We address them in turn.

---

4. The other two plaintiffs settled with Trinity and Matrix before trial.

## A. The Sophisticated User Doctrine Is the Law in South Carolina

First, Lawing argues the sophisticated user doctrine is not the law in South Carolina. This court refuted Lawing's argument years ago in *Bragg v. Hi–Ranger, Inc.*, 319 S.C. 531, 462 S.E.2d 321 (Ct.App.1995). In *Bragg*, the employee of a large electrical contractor died after he jumped from the bucket of an aerial bucket truck that was on fire, and his widow sued the manufacturer. 319 S.C. at 534–35, 462 S.E.2d at 323–24. The trial court charged the sophisticated user doctrine to the jury, which found for the manufacturer. 319 S.C. at 534, 549, 462 S.E.2d at 323, 331–32. We affirmed the decision to charge the jury on the doctrine, and thus recognized that the sophisticated user doctrine is part of the products liability law of South Carolina. 319 S.C. at 551, 462 S.E.2d at 332.

As we will explain in section III.B of this opinion, the sophisticated user doctrine is not some complex or novel concept in products liability law. It is simply the requirement that under the circumstances to which the doctrine applies, in determining whether a seller of a dangerous product acted with reasonable care in fulfilling its duty to warn, the jury must consider (1) what the purchaser already knew about the dangers associated with the product, and (2) whether under that circumstance, the seller can reasonably rely on the purchaser to warn its employees and others who might come into contact with the product.

## B. The Doctrine Is Not Preempted

Lawing next argues that even if the doctrine is the law in this state, federal law impliedly preempts it. He contends the sophisticated user doctrine conflicts with certain federal regulations because it "stands as an obstacle" to their "purposes and objectives." *See Priester v. Cromer*, 401 S.C. 38, 43, 736 S.E.2d 249, 252 (2012) (stating "any state law that conflicts with federal law is" preempted); 401 S.C. at 44, 736 S.E.2d at 252 (stating federal law impliedly preempts state law where "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives'" of the federal law (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61

S.Ct. 399, 404, 85 L.Ed. 581, 587 (1941))). We find the doctrine is not preempted.

## 1. The Sophisticated User Doctrine

To explain that the sophisticated user doctrine is not preempted, we must first explain what it is. The sophisticated user doctrine is based on section 388 of the Restatement (Second) of Torts (1965). *Bragg*, 319 S.C. at 550, 462 S.E.2d at 332; *see generally* David G. Owen, Products Liability Law 624 (2d ed.2008) (stating the "sophisticated user doctrine[ ] [is an] offshoot[ ] of a general principle expressed in *Restatement (Second) of Torts* § 388"). Section 388 is the basis of a products liability claim for negligent failure to warn. *See Livingston v. Noland Corp.*, 293 S.C. 521, 525, 362 S.E.2d 16, 18 (1987) (reciting the elements of a negligent failure-to-warn claim in products liability (citing *Gardner v. Q.H.S., Inc.*, 448 F.2d 238, 242 (4th Cir.1971) (applying South Carolina law and relying on section 388))).[5] On any negligence claim, including one for products liability, the plaintiff must prove the defendant failed to exercise reasonable care. *Branham v. Ford Motor Co.*, 390 S.C. 203, 210, 701 S.E.2d 5, 9 (2010). To understand the sophisticated user doctrine, it is particularly important that when determining whether any defendant acted with reasonable care, the jury should consider all the surrounding facts and circumstances. *See generally Thomas v. Atl. Greyhound Corp.*, 204 S.C. 247, 253, 29 S.E.2d 196, 198 (1944) ("Negligence is the want of due care; and due care means commensurate care under all the circumstances.").

The seller of a product is under a duty to warn the end user of dangers associated with the use of the product. *See* 63A Am.Jur.2d *Products Liability* § 1089 (2010) ("The supplier has a duty to warn the ultimate user . . . ."). Under some circumstances, however, it may be difficult or even impossible for the seller to meet its duty to warn the end user. One such

---

5. *See also Holst v. KCI Konecranes Int'l Corp.*, 390 S.C. 29, 43–44, 699 S.E.2d 715, 723 (Ct.App.2010) (quoting *Livingston*). The supreme court in *Livingston* and this court in *Holst* did not cite section 388. However, the elements listed in both opinions for a negligent failure-to warn claim track precisely the elements of section 388, and those elements can be traced directly to *Gardner*, a Fourth Circuit opinion applying South Carolina law, in which the court relied on section 388. *See* 448 F.2d at 242.

circumstance is where, as in this case, the seller supplies a product to an intermediary, such as a large employer whose employees are the people who will be using the product. This circumstance is specifically addressed in comment n to section 388, entitled "Warnings given to third person." In this comment, the American Law Institute recognized that products "are often supplied for the use of others, although the [products] ... are not given directly to those for whose use they are supplied." § 388 cmt. n. The Institute explained, "All sorts of [products] may be supplied for the use of others, through all sorts of third persons and under an infinite variety of circumstances." *Id.*

The sophisticated user doctrine arose from the circumstances contemplated in comment n, where a seller warns the intermediate purchaser, and relies at least in part on that purchaser to warn the end user. *See O'Neal v. Celanese Corp.,* 10 F.3d 249, 251 (4th Cir.1993) ("The sophisticated user defense is implicated in the situation in which A supplies a [product] to B, B in turn allows C to be exposed to the [product], C is injured by [the] exposure ..., and C claims that A should be liable ... for ... failure to warn...."). Because the plaintiff in any negligence action must prove the defendant failed to exercise reasonable care, the question upon which the liability of a seller turns when it relies on an intermediate purchaser to warn the end user is the same as when the seller warns the end user directly—whether the seller acted reasonably. The American Law Institute explained this in comment n, stating, "In all such cases the question may arise as to whether the person supplying the [product] is exercising ... reasonable care, which he owes to those who are to use it, by informing the third person through whom the [product] is supplied...." § 388 cmt. n. Our own Professor Owen has also explained this: "Addressing a seller's duty to warn when it sells a product to an intermediate supplier, comment *n* to § 388 provides that a seller may rely on the intermediary to provide warnings to the end-user *if that reliance is reasonable under the circumstances."* Owen, *supra,* at 624 (emphasis added). In this statement, the professor has explained the sophisticated user doctrine with all the complexity it deserves.

■ The sophisticated user doctrine does nothing more than require the jury, in determining whether a seller of a product acted with reasonable care in fulfilling its duty to warn, to consider what the seller knew about the sophistication of the buyer with regard to the dangers associated with the use of the product. This is essentially what we explained in *Bragg* when we stated, "In defining the sophisticated user defense, ... 'the question is whether the supplier ... acted reasonably in assuming that the intermediary would recognize the danger and take precautions to protect its employees.'" 319 S.C. at 550, 462 S.E.2d at 332 (quoting *O'Neal*, 10 F.3d at 253 n. 2). Thus, the sophisticated user doctrine applies when there is evidence the seller of a product was aware that an intermediate purchaser understood the dangers associated with the product and had the ability to effectively communicate those dangers to the end user. *See O'Neal*, 10 F.3d at 252 (stating the sophisticated user doctrine applies "when the supplier shows that it was reasonable to believe that a warning was unnecessary because the intermediary was already well aware of the danger").[6] The doctrine requires the jury to consider such evidence in determining whether the seller acted reasonably in warning of the dangers associated with the product, and particularly whether the seller acted reasonably in the extent to which it relied on the purchaser to warn the end user.

■ Lawing's contention that the trial court erred in charging the sophisticated user doctrine applies not only to his negligence cause of action for failure to warn, but also to his breach of implied warranty cause of action. The sophisticated user doctrine originated in the context of a claim for negligent failure to warn, but it also applies to failure-to-warn causes of action based on breach of implied warranty. *See Carrel v. Nat'l Cord & Braid Corp.*, 447 Mass. 431, 852 N.E.2d 100, 109 (2006) (holding the sophisticated user doctrine applies in claims of "negligent failure to warn and ... failure to warn under breach of warranty"). This is so because all products liability causes of action turn on the question of reasonable-

---

6. *O'Neal* was decided under Maryland law. 10 F.3d at 251. As demonstrated by this court's reliance on it in *Bragg*, 319 S.C. at 550, 462 S.E.2d at 332, however, its reasoning as to the sophisticated user doctrine is no less applicable in South Carolina.

ness. *See Branham,* 390 S.C. at 210, 701 S.E.2d at 8 (stating "all products liability actions, regardless of the stated theory, have common elements," including " 'that the injury occurred because the product was in a defective condition unreasonably dangerous to the user' " (quoting *Madden v. Cox,* 284 S.C. 574, 579, 328 S.E.2d 108, 112 (Ct.App.1985))). The jury focuses on the conduct of the seller when analyzing the fault element of a negligence cause of action, but when analyzing the unreasonably dangerous element of any cause of action, the jury focuses on the product. *See Bragg,* 319 S.C. at 539, 462 S.E.2d at 326 (stating "under a negligence theory, . . . unlike strict liability, the focus is on the conduct of the seller or manufacturer, and liability is determined according to fault"). However, to the same extent evidence of the purchaser's sophistication relates to whether the seller's conduct was reasonable, the evidence also relates to whether the product as sold under those circumstances was "unreasonably" dangerous.

## 2. Lawing's Preemption Argument

Lawing bases his preemption argument on 29 C.F.R § 1910.1200(F)(1) (2003), which provides that a chemical manufacturer, importer, or distributor must "ensure that each container of hazardous chemicals leaving the workplace is labeled, tagged or marked with the following information: (i) Identity of the hazardous chemical(s); (ii) Appropriate hazard warnings; and (iii) Name and address of the chemical manufacturer, importer, or other responsible party."[7] He also relies on 49 C.F.R. §§ 172.406 and 172.407 (2003), which include requirements for the design and placement of labels, and § 172.426, which provides the specific design for the oxidizer symbol. Lawing argues these regulations impose a duty on Trinity and Matrix to warn about the dangers of sodium bromate, and the sophisticated user doctrine conflicts with the regulations because it "has the effect of defeating the duty to warn that was clearly imposed as an integral part of the federal regulatory scheme." Because of this conflict, he

---

7. Lawing also points out that the portions of § 1910.1200 on which he relies have been adopted by the state Department of Labor, Licensing, and Regulation. *See* 9 S.C.Code Ann. Regs. Ch. 71, Art. 1, Subart. 6 (2012).

28

argues, the federal regulations preempt the state-law doctrine. *See Priester*, 401 S.C. at 43–44, 736 S.E.2d at 252.

Lawing's argument fails, however, because it depends on an incorrect premise—that the sophisticated user doctrine, if applicable, means a supplier had no duty to warn. As we have explained, the sophisticated user doctrine does not operate to defeat any duty. It simply identifies circumstances the jury must consider when determining whether the supplier's duty to warn was breached. The Fourth Circuit explained the error of Lawing's argument in *O'Neal:*

> Part of the problem that may lead some to look askance at [the sophisticated user doctrine] is in the language that some courts have used to describe it, in particular the notion that where the elements or prerequisites of it exist, the supplier is "absolved" of any duty to warn ultimate users. That notion is not only unnecessary to the [doctrine] but in fact is inconsistent with the rationale of comment n to Restatement § 388. There *is* a duty to warn of defects or propensities that make a product hazardous, and that duty *does* extend ordinarily to those who may reasonably be expected to use or come into harmful contact with the product. It is *not* a duty, we think, from which the supplier can be entirely *absolved.* The question, rather, is, what conduct will suffice to discharge that duty?

10 F.3d at 251 (quoting *Kennedy v. Mobay Corp.*, 84 Md.App. 397, 579 A.2d 1191, 1199 (1990), *aff'd*, 325 Md. 385, 601 A.2d 123 (1992)); *see also Gray v. Badger Min. Corp.*, 676 N.W.2d 268, 278 (Minn.2004) (quoting the above passage from *Kennedy* ).

*O'Neal, Gray,* and *Kennedy* demonstrate that the sophisticated user doctrine does not address the legal question of whether the supplier had a duty to warn. It could not do so, because whether a duty exists is a question of law for the court. *See Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 290, 688 S.E.2d 125, 128 (2010) (stating the existence of a duty "is a question of law for the court to determine"); *Doe ex rel. Doe v. Batson,* 345 S.C. 316, 323, 548 S.E.2d 854, 857 (2001) (stating "[t]he existence of a duty owed is a question of law for the courts"). As the Fourth Circuit pointed out in *O'Neal,* "[t]here is a duty to warn," 10 F.3d at

251, and thus, when courts have stated that under the sophisticated user doctrine there is no duty to warn, they have misspoken. *See, e.g., Willis v. Raymark Indus., Inc.,* 905 F.2d 793, 796 (4th Cir.1990) (stating that when the doctrine applies, a supplier "is absolved" of its duty to warn) (effectively overruled by *O'Neal,* 10 F.3d at 251). Rather, the sophisticated user doctrine addresses the factual question of whether it was reasonable for the supplier of a product to rely on the purchaser to warn the end user of the dangers associated with that product. In other words, the doctrine addresses breach of duty, not the existence of duty.

Therefore, the sophisticated user doctrine does not stand as an obstacle to fulfillment of the safety objectives embodied in the federal regulations. On the contrary, what the regulations require coincides with the reasonableness requirement on which the sophisticated user doctrine is based. Here, the bags featured the words "SODIUM BROMATE" printed in black letters on one side and the oxidizer symbol printed on the other. Matrix provided an MSDS that warned of fire and explosion hazards. Whether this was enough for Trinity and Matrix to comply with the OSHA regulations—specifically the key requirement of "[a]ppropriate hazard warnings" under 29 C.F.R. § 1910.1200(F)(1)(ii)—is precisely the same question the jury must answer under the sophisticated user doctrine— what was reasonable under the circumstances. *See In re Welding Fume Prods. Liab. Litig.,* 364 F.Supp.2d 669, 696 (N.D.Ohio 2005) (stating § 1910.1200 "does not prescribe in any way the language a chemical manufacturer or other employer must use to warn about health hazards;" it requires only that some warning be provided and that the warning be adequate). Because the federal regulations require warnings that are "appropriate" under the circumstances, and the sophisticated user doctrine requires only that certain circumstances be considered in determining what is reasonable (or appropriate), there is no conflict between the two, and the sophisticated user doctrine is not preempted.

## C. Evidence Supported Giving the Charge

A trial court is required to charge principles of law that apply to the issues raised in the pleadings and supported by the evidence at trial. *Clark v. Cantrell,* 339 S.C. 369, 390,

529 S.E.2d 528, 539 (2000). Lawing argues the evidence did not warrant charging the jury on the sophisticated user doctrine. We disagree.

■ The sophisticated user doctrine should be charged whenever there is evidence that supports a finding that the seller or supplier acted reasonably in relying on the purchaser to warn the end user of the dangers associated with the product. As we stated in *Bragg*, the question posed by the doctrine is "whether the supplier ... acted reasonably in assuming that the intermediary would recognize the danger and take precautions to protect its employees." 319 S.C. at 550, 462 S.E.2d at 332.

■ In this case, there is evidence that Trinity and Matrix knew the nature of Engelhard's business, Engelhard's understanding of the dangers of sodium bromate, and the steps Engelhard took to protect employees from the dangers of hazardous materials. Trinity and Matrix knew the large quantities of sodium bromate they were procuring for Univar were ultimately being sold to, and would be used by, Engelhard. They also knew that before Engelhard started buying sodium bromate from Univar, Engelhard inspected and tested samples of the product. A July 2002 email from Tim Griffin of Trinity to Sherry Green of Matrix discusses progress those companies and Univar made towards becoming Engelhard's sodium bromate supplier. The email mentions that Engelhard reviewed their proposed specifications for the chemical, "eliminate[d] the optical density" specification, and approved the specifications after making that change. The email also states that they delivered a sodium bromate sample to the Seneca facility, and that "they [Engelhard] are to run lab trials and advise results." Explaining that email at trial, Angela Grenados, Matrix's vice president, testified Engelhard required samples be delivered to the facility for testing. Trinity and Matrix sent Engelhard three samples.

Grenados also testified she knew Engelhard was a "large sophisticated manufacturer" that used sodium bromate. At trial, one of the plaintiffs' lawyers asked Grenados whether Matrix ever visited the facility to see how Engelhard was storing sodium bromate. She testified Matrix did not do so because "[i]t's my impression that Engelhard is a very sophis-

ticated company and I'm sure their health and safety regulations are much beyond what my comprehension would be." She never asked Engelhard about its storage and safety practices because "I felt like [Engelhard's] reputation went beyond my asking."

John Munson was the Univar salesman who interacted with Engelhard's purchaser, David Williams. Munson testified Univar employed "safety and regulatory people" who were available to speak with Engelhard if it had any questions or concerns about the chemicals it bought from Univar. Univar did not visit the facility or ask Engelhard whether it had any questions about sodium bromate and safety. Munson testified that in his conversations with Williams, he learned "Engelhard has very qualified people and very strict regulations and they handle this themselves in house." Munson also expected Engelhard would perform hazard analyses on the sodium bromate because it was "the most familiar with the operations of their plant and [was] best suited to do those kinds of evaluations." Finally, Munson testified he knew Engelhard inspected shipments upon arrival, and if a shipment did not comply with OSHA's labeling requirements, Engelhard would refuse it. Munson said, "if this material had ended up in Engelhard's dock and there was anything wrong with it, I would have gotten a call from David Williams immediately and [Williams would have] said, 'we got a problem.' We never got a call like that."

Finally, Griffin testified Trinity and Matrix provided the MSDS for the sodium bromate. Before the shipment would arrive, one of the two companies faxed a copy of the MSDS to Univar. When the shipment arrived at the facility, Engelhard would get a hard copy of the MSDS that warned about the danger that sodium bromate can accelerate existing fires and that containers of it could explode. The MSDS also instructed users not to store sodium bromate next to combustible materials and to keep it from contacting organic matter.

Considered as a whole, this evidence supports the trial court's decision to charge the jury on the sophisticated user doctrine. It shows Trinity and Matrix knew Engelhard used large quantities of sodium bromate and had tested samples of the product in its laboratory before deciding to buy it. It also

shows that employees of Matrix, a wholly-owned subsidiary of Trinity, and Univar, the company to which Trinity directly sold the sodium bromate, believed Engelhard had a safety program that ensured employees were adequately informed of the dangers of the chemicals in the facility. Finally, it shows Trinity and Matrix knew about the MSDS and that Engelhard received it. A jury could infer from this evidence that Trinity and Matrix acted reasonably in providing warnings on the bags and in the MSDS, relying on Engelhard to provide its employees any additional warnings about the dangers of sodium bromate. Although other evidence presented at trial could support a jury finding the sophisticated user doctrine did not apply, or that Trinity and Matrix did not act reasonably, those questions were ultimately for the jury. The question we must answer is whether there is evidence in the record to support giving the charge. We hold there is.

### D. Errors in the Substance of the Charge

■ Therefore, the trial court correctly decided to charge the sophisticated user doctrine to the jury. *See O'Neal*, 10 F.3d at 252. However, the court incorrectly charged the jury that under the doctrine, "a distributor or supplier has no duty to warn of potential risks or dangers inherent in a product if the product is distributed to what we call a ... sophisticated user," and that "[i]f you find that the sophisticated user defense applies in this case, then you must find that the defendants owed no duty to warn." We will not address this error, however, because it is not preserved for appellate review.

After the jury charge, the trial court asked the lawyers if they had any objections. Lawing's attorney stated, "Other than the fact that we take exception [that] the sophisticated user charge has been given at all, because we don't think it applied." Thus, Lawing did not make an objection to the correctness of the language of the charge, only to whether the doctrine was applicable. Therefore, Lawing's arguments regarding the substantive correctness of the charge are not preserved. *See Harris v. Univ. of S.C.*, 391 S.C. 518, 528, 706 S.E.2d 45, 50 (Ct.App.2011) (finding argument regarding substance of jury charge unpreserved because it was not raised to and ruled upon by the trial court).

We affirm the trial court's decision to charge the jury on the sophisticated user doctrine.

## IV. Granting Summary Judgment on the Strict Liability Claims

South Carolina Code section 15–73–10 provides, "One who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm caused to the ultimate user or consumer. . . ." *See also Bray v. Marathon Corp.*, 356 S.C. 111, 117, 588 S.E.2d 93, 96 (2003) (stating section 15–73–10 "limits liability to the user or consumer" of a product). In granting summary judgment against Lawing on his strict liability cause of action, the trial court held Lawing was not a user or consumer of the sodium bromate. Lawing argues the trial court took too narrow a view of the term "user." We agree.

The parties' dispute over the meaning of "user" is a question of statutory interpretation, the goal of which is to give effect to the legislature's intent. *Kerr v. Richland Mem'l Hosp.*, 383 S.C. 146, 148, 678 S.E.2d 809, 811 (2009); *see also Bray*, 356 S.C. at 117 n. 6, 588 S.E.2d at 96 n. 6 (noting in its discussion of section 15–73–10 that "the judiciary is limited to interpretation and construction of that statute"). In enacting section 15–73–10 and several related sections, the legislature did not use specific definitions to express its intent regarding these terms. Rather, the legislature stated that the American Law Institute's comments to section 402A of the Restatement (Second) of Torts (1965) are "the legislative intent."[8] S.C.Code Ann. § 15–73–30 (2005). Therefore, to determine what the legislature meant by "user," we look to the comments to section 402A.

Several comments illustrate who is a user. First, comment 1 is entitled "User or consumer." Although the comment does not specifically define either of the terms, it indicates they are to be construed broadly. The comment explains that a person may recover in strict liability even though he did not buy the product: "He may be a member of the family of the final purchaser, *or his employee*, or a guest at his table, or a mere

---

8. Section 15–73–10 is an "almost verbatim" codification of section 402A. *Schall v. Sturm, Ruger Co.*, 278 S.C. 646, 648, 300 S.E.2d 735, 736 (1983).

donee from the purchaser." § 402A cmt. 1 (emphasis added). In addition, " 'Consumers' include not only those who in fact consume the product, but also those who prepare it for consumption." *Id.* Finally, user is not limited to someone actively operating or manipulating the product; rather, it "includes those who are passively enjoying the benefit of the product." *Id.*

Second, comment j discusses the requirement that a seller provide directions and warnings on the container of a product. The comment contemplates that the seller will warn people of the product's dangerous qualities so that certain people who see the warning will *not* use the product. Comment j provides an example:

Where ... the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it. . . .

§ 402A cmt. j. Thus, the comment contemplates that a person will "use" the warning to determine whether it is safe for the person to use or consume the product, or in a situation like the one we face in this case, whether he should move the product to another location before doing work that may be dangerous in the vicinity of the product.

Finally, comment o helps define "user" and "consumer" by illustrating what those terms do not mean. When the American Law Institute adopted section 402A, it stated it expressed no opinion as to whether the rule should apply "to persons other than users or consumers." § 402A caveat. Explaining that caveat, comment o describes a "non-user" as a "[c]asual bystander" and others whose contact with the product is incidental, such as "a passer-by injured by an exploding bottle, or a pedestrian hit by an automobile." § 402A cmt. o. These examples illustrate that the Institute intended that the people to be excluded from the definition of "user" and "consumer" are much farther removed from the product than Lawing and his co-workers were from the sodium bromate.

Considering the comments together, we believe the legislature intended that the term "user" include persons who could foreseeably come into contact with the dangerous nature of a

product. Thus, a person who examines a product for warnings and other safety information is one whom the seller intends will use that information to avoid the dangers associated with the product, and thus is a person who foreseeably could come into contact with its dangerous nature. Such persons enjoy the benefit of the warning by learning how to use the product safely, or by learning that they should avoid the product altogether. They are not "casual bystanders," but instead use the product by reading the warning to learn what, if anything, they can safely do with it.

Surprisingly, there is little case law on the definition of "user" under section 402A. In *Patch v. Hillerich & Bradsby Co.*, 361 Mont. 241, 257 P.3d 383 (2011), the Supreme Court of Montana addressed a completely different factual situation that nevertheless helps us understand whether Lawing is a user on the facts of this case. In *Patch*, a young man pitching in a baseball game died when he was struck by a batted ball. 257 P.3d at 386. His parents sued the manufacturer of the bat, asserting a failure-to-warn claim under Montana's strict liability statute. *Id.* They claimed the bat was defective and unreasonably dangerous because the manufacturer did not warn that balls hit by the bat could travel with such high velocity that other players, particularly pitchers, could be hit by the ball before normal human reaction time would allow them to put up a hand or glove. *Id.* The jury found for the plaintiffs. *Id.* On appeal, the manufacturer argued it should have been granted summary judgment because the pitcher was not a user or consumer of the bat. 257 P.3d at 387. It argued that the person who bought the bat and those who swung it to hit the ball were the only users or consumers under Montana's strict liability statute, and therefore the plaintiffs could not recover. *Id.*

The court disagreed. Noting that Montana's strict liability statute is a codification of section 402A, the court found the manufacturer's "narrow interpretation of the terms user and consumer is contrary to the definition of the terms as contained in" section 402A. *Id.* The court reviewed comment l and found the drafters of section 402A "broadly defined" user and consumer. *Id.* In light of the comment, and "the realities of the game of baseball," the court held that "[t]he risk of harm accompanying the bat's use extends beyond the player who holds the bat in his or her hands.... [A]ll of the players,

including [the pitcher], were users or consumers placed at risk by the increased exit speed caused by" the bat. 257 P.3d at 388. Therefore, the supreme court concluded the trial court did not err in denying the manufacturer's summary judgment motion. *Id.*

█ Like the bat manufacturer in *Patch*, Trinity and Matrix define "user" and "consumer" too narrowly by considering only whether Lawing was doing something with the sodium bromate at the time of the accident. They argue Lawing was not a user or consumer of the sodium bromate because the chemical itself was not involved in the pipe removal operation. However, in light of the comments discussed above illustrating the legislative intent of section 15–73–10, and the realities of modern industrial practice, we hold Lawing was a user of the sodium bromate. Warnings and other safety information on packaging are part of the product. *See* § 402A cmt. h ("No reason is apparent for distinguishing between the product itself and the container in which it is supplied; and the two are purchased by the user or consumer as an integrated whole. . . . The container cannot logically be separated from the contents when the two are sold as a unit . . . ."). Manufacturers and suppliers of chemicals and other products not only foresee, but intend, that workers like Lawing will use the information on the packaging even if they are not actually using the chemical within the packaging. *See* Owen, *supra*, at 621 ("The purpose of warnings . . . is to provide information to people about hazards and safety information they do not know about so they may avoid the product altogether or avoid the danger by careful use.").

Trinity and Matrix make two other arguments regarding Lawing's status as a user under section 15–73–10. First, they argue *Bray* supports their narrow interpretation of the term user. In *Bray*, the supreme court held the plaintiff was a user because she was physically operating the trash compactor's controls at the time of her co-worker's death. 356 S.C. at 115, 116–17, 588 S.E.2d at 94, 95–96. We see nothing in *Bray* that contradicts our interpretation of section 15–73–10. Trinity and Matrix also argue that even if Lawing was a user of the sodium bromate, he cannot recover because his use was not an intended use. *See Claytor v. Gen. Motors Corp.*, 277 S.C. 259, 264, 286 S.E.2d 129, 132 (1982) ("A product may, by reason of its nature and use, be unreasonably dangerous unless proper

instructions and warnings are supplied for its *intended use.*" (emphasis added)). This argument has the same flaw as their argument that Lawing was not a user—it focuses exclusively on the sodium bromate itself, rather than the product as a whole, including the packaging and particularly the warning. Trinity and Matrix cannot seriously suggest they did not intend for Lawing to examine the bags for information warning him it would be unsafe to leave them in the work area. Lawing testified he looked at the pallets and the bags for any labels, and he saw nothing indicating he should not work near them. In that respect, Lawing used the product exactly as Trinity and Matrix intended.

Accordingly, Lawing was a user of the product. By granting summary judgment on the ground that he was not a user, the trial court erred.

## V. Conclusion

We **AFFIRM** the trial court's decision to charge the jury on the sophisticated user doctrine. However, we **REVERSE** the trial court's decision granting summary judgment on Lawing's strict liability cause of action, and we **REMAND** to the circuit court for a new trial only on that cause of action.

GEATHERS and LOCKEMY, JJ., concur.