# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Scott F. Lawing and Tammy R. Lawing,
Petitioners/Respondents,

v.

Univar, USA, Inc., Trinity Manufacturing, Inc., and
Matrix Outsourcing, LLC, Defendants,

Of Whom Trinity Manufacturing, Inc. and Matrix
Outsourcing, LLC, are Respondents/Petitioners.

Appellate Case No. 2013-002464

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Oconee County
J. C. Nicholson, Jr., Circuit Court Judge

---

Opinion No. 27594
Heard April 9, 2015 – Filed December 2, 2015

---

## AFFIRMED IN PART, REVERSED IN PART

---

John S. Nichols, of Bluestein, Nichols, Thompson &
Delgado, of Columbia, Robert P. Foster, of Foster &
Foster LLP, of Greenville, William P. Walker, Jr., and S.
Kirkpatrick Morgan, Jr., both of Walker and Morgan,
LLC, of Lexington, and Larry C. Brandt, of Larry C.
Brandt, PA, of Walhalla, all for Petitioners/Respondents.

Christian Stegmaier and Amy L. Neuschafer, both of
Collins and Lacy, PC, of Columbia, for Respondents/
Petitioners.

---

**CHIEF JUSTICE TOAL:**  In this products liability action, Trinity
Manufacturing, Inc. (Trinity), and Matrix Outsourcing, LLC (Matrix), argue that
the court of appeals erred in reversing the trial court's decision to grant summary
judgment to them on a strict liability cause of action.  *See Lawing v. Trinity Mfg.,
Inc.*, 406 S.C. 13, 749 S.E.2d 126 (2013).  In their cross-appeal, Scott and Tammy
Lawing ask this Court to reverse the court of appeals' decision affirming the trial
court's decision to charge the jury on the sophisticated user defense.  We affirm in
part and reverse in part the decision of the court of appeals.

## FACTS/PROCEDURAL BACKGROUND

This case revolves around the packaging and labeling of sodium bromate, a
chemical which contributed to a fire that occurred in a plant owned by Engelhard
Corporation (Engelhard) in Seneca, South Carolina, in June 2004.  At the time of
the fire, Scott Lawing worked at Engelhard's Seneca plant as a maintenance
mechanic.[1]  Engelhard produced a precious metal catalyst used in the automobile
industry, and refined metals from recycled materials.

To complete its refining process, Engelhard used approximately 120 metric
tons per annum of sodium bromate, which is classified as an oxidizer.  An oxidizer
is a chemical that initiates or promotes combustion in other materials, thereby
causing fire either by itself or through the release of oxygen or other gases.  In
other words, when an oxidizer such as sodium bromate is heated to a certain
temperature, it releases oxygen and contributes to the combustion of other
materials.

Engelhard purchased the sodium bromate from Univar USA, Inc. (Univar).
Univar sourced the sodium bromate through Trinity, who in turn, utilized its
subsidiary, Matrix, to obtain the sodium bromate from a Chinese manufacturer.
The Chinese manufacturer shipped the sodium bromate to the Port of Charleston,

---

[1] Engelhard was later purchased by BASF Corporation, which now operates the
facility.

and from there, a common freight carrier delivered the sodium bromate directly to Engelhard. Therefore, neither Univar, Trinity, nor Matrix ever inspected or handled the sodium bromate.

The shipment of sodium bromate involved in the fire was delivered to Engelhard on February 16, 2004, whereupon Engelhard inspected and accepted the shipment. The sodium bromate arrived packaged in woven plastic bags, each weighing twenty-five kilograms.[2] A warning label on one side of each bag displayed the universally recognized yellow oxidizer symbol.[3] The reverse side of each bag contained black text, including the words "sodium bromate," and other information regarding the material safety data sheet (MSDS)[4] for sodium bromate.

The bags of sodium bromate arrived at Engelhard stacked upon each other on wooden pallets, with thirty-six bags per pallet. The pallets were stacked two pallets high. Each of the pallets was "shrink-wrapped" so that the bags would remain on the pallet.

Paul Bailey, an Engelhard employee who was responsible for receiving shipments when the fire occurred, testified that none of the pallets in the February 2004 shipment contained warnings identifying the contents of the pallets as an oxidizer, and there were no warnings on the sides of the bags themselves that could be seen through the shrink-wrap. Within each shrink-wrapped pallet, some bags of the sodium bromate were stacked so that the black text on the bags appeared face-up, while other bags were positioned such that the yellow oxidizer symbol appeared face-up.

---

[2] Specifically, the bags were made of polypropylene and polyethylene—both combustible materials.

[3] The oxidizer symbol is a yellow diamond with black borders. Inside the diamond is a drawing of a flame, and underneath, the words "OXIDIZER" or "OXIDIZING AGENT" appear in black ink. The United States Department of Transportation requires this symbol be used in the labeling of oxidizers such as sodium bromate. *See* 49 C.F.R. § 172.426 (2003).

[4] Along with the delivery of the chemical, Engelhard was provided the MSDS for sodium bromate. The MSDS warned that if sodium bromate made contact with other materials, it could cause a fire, and that sodium bromate "[m]ay accelerate burning if involved in a fire." Engelhard maintained MSDSs in offices throughout its plant for the various chemicals used in its production.

At trial, Dr. Jerry Purswell, who testified as an expert in the field of Occupational Health and Safety Administration (OSHA) regulations, opined that the labeling on the bags of sodium bromate did not satisfy the OSHA HazCom requirements[5] for an appropriate warning label because the oxidizer symbol was not prominently displayed on the bags. Dr. Purswell testified that in his opinion, the written material on the bags did, however, satisfy the relevant Department of Transportation (DOT) requirements.[6]

Upon receipt of a shipment of sodium bromate, Engelhard employees typically moved the double-stacked pallets of sodium bromate—still shrink-wrapped—directly to the warehouse for storage, where Engelhard stored the chemical until it was needed for production.

On May 20, 2004—the week before Engelhard's annual "shutdown week"— Engelhard employees moved four pallets of sodium bromate from the warehouse to the refinery hallway to be used in production. During the shutdown week, Engelhard stopped regular production in order to perform routine maintenance. However, Engelhard policies provided that production materials were not to be left in the refinery during shutdown week.

On June 1, 2004, Lawing, along with Keith Black and Curtis Martin, were assigned to work under Steve Knox during the shutdown week as part of a maintenance crew tasked with using an oxyacetylene cutting torch to cut out and replace condensate pipe in the refinery hall—not far from where the four pallets of sodium bromate had recently been moved.

Pursuant to Engelhard's policies, use of the oxyacetylene torch required the issuance of a hazardous work permit prior to the commencement of the project. Engelhard policies provided that before the permit could be issued, "a thorough inspection of the immediate work area and all areas adjacent for the presence of

---

[5] 29 C.F.R. § 1910.1200(f) (2003). Essentially, the regulation requires labels on the containers of hazardous chemicals; states that the labels must provide the identity of the hazardous chemicals and appropriate hazard warnings; and describes other requirements for the labels, i.e., that the warnings must be "prominently displayed on the container." *See id.*

[6] 49 C.F.R. § 172.406 (2003) (describing the proper placement of labels on packages containing hazardous materials); 49 C.F.R. § 172.407 (2003) (setting forth requisite label specifications, such as durability, design, size, and color).

combustible and/or flammable materials" must take place and that "[a]ll such materials will be removed to a safe location for the duration of the Hotwork [sic]." Therefore, to obtain a hazardous work permit for the project, Knox toured the work area prior to the start of the maintenance work. Knox testified that he noticed the pallets of sodium bromate within the work area, and walked close enough to the pallets to ensure that there was no oxidizer symbol on them. Although Knox did not see the oxidizer symbol, he noticed black text on the sides of the bags. Knox did not know what sodium bromate was, but admitted that if he had seen an oxidizer symbol on the pallets, he would have ensured that employees moved the pallets from the work area before the maintenance began.[7]

Martin and Lawing each testified that they noticed the bags of sodium bromate in the work area on the day of the fire, but saw no label indicating that they should move the bags. Lawing testified that when he saw the bags, he looked for a "label or something that told me I needed to move it" and when he did not see one, he "thought they were fine." Lawing stated that if he had seen an oxidizer symbol, he would have moved the pallets. Lawing testified that at the time, he thought the bags contained baking soda.

The maintenance crew used the oxyacetylene torch to cut the pipe, which was suspended approximately fifteen to twenty feet above the floor. After about two hours of work, a piece of hot slag fell and landed on or near one of the pallets of sodium bromate. There was a "flash" on the pallet, which erupted into a ball of fire that engulfed Lawing, Martin, and Black. According to Knox, the eruption of fire "sounded like a jet taking off."

Each of the men suffered severe burns and serious injuries which totally disabled them and rendered them in need of substantial medical care for the rest of their lives. Lawing testified that he suffered second and third degree burns on forty-two percent of his body, and that his lungs and eyes were also burned.

The Lawings—as well as Black and Martin (collectively, the plaintiffs)[8] commenced lawsuits against Univar, Trinity, and Matrix (collectively, the

_____

[7] Prior to the project, each of the maintenance workers received hazard communication training which taught them to recognize warning symbols— including the oxidizer symbol—on packages of chemicals as well as the importance of such labels.

[8] Of the three plaintiffs whose cases were consolidated for trial, the Lawings are the only plaintiffs involved in this appeal.

defendants), each alleging causes of action for strict liability, negligence, and breach of the implied warranty of merchantability.[9]  The Lawings also asserted a breach of express warranty cause of action against Univar.  Further, Tammy Lawing contended that she suffered loss of consortium as a result of her husband's injuries.

Prior to trial, the defendants made a number of dispositive motions, including motions for summary judgment on the Lawings' claims.  In particular, the defendants filed a joint motion for summary judgment on the Lawings' strict liability cause of action.  The trial court addressed these motions and other matters during a two-day pre-trial hearing.  The trial court granted the defendants' motion for summary judgment on the strict liability claim, ruling that Lawing was not a "user" of sodium bromate as required by section 15-73-10 of the South Carolina Code.  S.C. Code Ann. § 15-73-10 (2005) (requiring a plaintiff to be a "user" or "consumer" of a product to recover under a strict liability theory).

The trial court consolidated the plaintiffs' cases and bifurcated the trial into a liability phase and a damages phase.  Five causes of action were submitted to the jury.  Three were against all of the defendants:  negligence as to packaging, negligence as to warning labels,[10] and breach of the implied warranty of merchantability.  Two causes of action were against Univar only:  breach of express warranty as to packaging and breach of express warranty as to warning labels.

Although the trial court had denied the defendants' motion for a directed verdict as to the sophisticated user defense at the conclusion of all of the evidence,

---

[9] Each plaintiff sought and received workers' compensation benefits as a result of the fire.  Accordingly, the Workers' Compensation Act provided the exclusive remedy against Engelhard.  *See* S.C. Code Ann. § 42-1-540 (2015) (providing that the rights and remedies granted to an employee under the Workers' Compensation Act "shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin as against his employer, at common law or otherwise, on account of such injury loss of service or death").

[10] With regard to the claims involving the warning labels—or lack thereof—on the sodium bromate, the plaintiffs proceeded under the theory that the suppliers should be held liable because the requisite warning labels were not prominently displayed or clearly visible.

the court charged the defense to the jury. As to the negligence cause of action, the trial court charged the jury, in pertinent part:

> Federal regulations impose a duty on suppliers to warn of possible dangers arising from the use of their product. This requirement comes from the [OSHA] regulation[] 1910.1200(f), which says that the chemical manufacturer, importer, or distributor shall ensure that each container of hazardous chemicals leaving the workplace is labeled, tagged or marked with the following: [i]dentity of the hazardous chemicals; appropriate hazard warnings; and the name and address of the chemical manufacturer, importer, or other responsible party. The federal regulations are in evidence. The court has ruled that the circumstantial evidence in the case proves that the bags were labeled. The plaintiff alleged that the labels were not clearly visible or prominently displayed, not that there was not a label on the bags.

The trial court then explained that South Carolina common law requires a supplier of a dangerous product to provide a warning to the user, consumer, or purchaser. The trial court stated:

> A supplier may provide the information needed for the safe use of the product to a third person, but this may not relieve the supplier of responsibility in all cases. Where the supplier provides the information to a third person, and not directly to the user, consumer, or purchaser, the supplier must give all the information needed for the product's safe use and must use a method of giving that information that reasonably ensures that it will reach the user, consumer, and purchaser. The supplier must inform the third person of the dangerous character of the product or of the precautions which must be used in using the product to make it safe. The supplier has a duty to be reasonably sure that the information or warning about the product will reach those the supplier should expect to use the product. To determine whether the supplier should reasonably expect the method used to reach the user, consumer, or purchaser, you should consider the magnitude of the danger, the purpose for which the product is made, and the practical means of disclosing the information. If the supplier should reasonably foresee that the warnings given to third parties, will not be adequately passed on to the probable users, consumers, or purchasers of the product and that the dangers will not be obvious to the users, consumers, or purchasers, the supplier's duty

to warn may extend to those persons endangered or affected by the foreseeable use of the product. A sophisticated user defense could be appropriate under the circumstances. I will charge you on the sophisticated user defense later.

After explaining the elements of negligence, the trial court charged the sophisticated user defense:

> The [defendants] have also pled the sophisticated user defense. Now, ladies and gentlemen, under the South Carolina law, a distributor or supplier has no duty to warn of potential risks or dangers inherent in a product if the product is distributed to what we call a learned intermediary or distributed to a sophisticated user who might be in a position to understand and assess the risks involved, and to inform the ultimate user of the risks, and to, therefore, warn the ultimate user of any alleged inherent dangers involved in the product. Simply stated, the sophisticated user defense is permitted in cases involving an employer who was aware of the inherent dangers of a product which the employer purchased for use in his business and can be reasonably relied upon to warn ultimate users of the product. Such an employer has a duty to warn his employees of the danger of the product.

> You may consider a number of factors in determining whether the sophisticated user [defense] applies. Those factors include: The dangerous condition of the product; the purpose for which the product is used; the form of any warnings given; the reliability of the third party as a conduit of necessary information about the product; the magnitude of the risk involved and the burdens imposed on the supplier by requiring that it directly warn all users.

> If you find that the sophisticated user defense applies in this case, then you must find that the defendants owed no duty to warn; therefore, you must find in favor of the defendants on the plaintiffs' negligence claim.

The jury found for the Lawings on only one cause of action: breach of express warranty as to warning labels against Univar. The jury returned defense

verdicts on the Lawings' other causes of action. Thereby, Trinity and Matrix were absolved of liability.[11]

A consolidated appeal to the court of appeals followed. However, during the pendency of the appeal, Univar settled with all of the plaintiffs. Only the Lawings' appeal of the grant of summary judgment on their strict liability claim and their appeal of the jury verdict in favor of Trinity and Matrix proceeded to disposition at the court of appeals.

The court of appeals affirmed the trial court's decision to charge the sophisticated user defense on the negligence and breach of the implied warranty of merchantability claims. *Lawing*, 406 S.C. at 33, 749 S.E.2d at 136. In addition, the court of appeals reversed the trial court's decision to grant Trinity and Matrix's summary judgment motion on the strict liability claim, finding that the trial court too narrowly interpreted the term "user" under section 15-73-10, and holding that Lawing was indeed a "user" of sodium bromate for purposes of the statute. *Id.* at 37, 749 S.E.2d at 138. Therefore, the court of appeals remanded the matter for a new trial on the Lawings' strict liability claim. *Id.* at 37, 749 S.E.2d at 139.

The Lawings, as well as Trinity and Matrix, filed petitions for writs of certiorari, asking this Court to review the court of appeals' decision. This Court granted both petitions for writs of certiorari to review the court of appeals' opinion pursuant to Rule 242, SCACR.

## ISSUES PRESENTED

I. Whether the court of appeals erred in holding that Lawing was a "user" of the sodium bromate for purposes of section 15-73-10, and thus reversing the trial court's decision to grant Trinity and Matrix summary judgment on the Lawings' strict liability cause of action?

II. Whether the court of appeals erred in affirming the trial court's decision to charge the jury on the sophisticated user defense?

---

[11] Black and Martin settled with Trinity and Matrix before trial.

## I. Strict Liability Cause of Action

Trinity and Matrix argue that the court of appeals erred in holding that Lawing was a "user" of the sodium bromate, and therefore, the court of appeals erred in reversing the trial court's grant of summary judgment on the strict liability claim, which was based on the trial court's finding that Lawing was not considered a "user" under section 15-73-10 of the South Carolina Code. Moreover, Trinity and Matrix argue that the court of appeals set forth a far too expansive definition of "user" for purposes of a strict liability analysis under South Carolina law.

### a. Standard of Review

When reviewing an order granting summary judgment, the appellate court applies the same standard as that used by the trial court pursuant to Rule 56(c), SCRCP. *Turner v. Milliman*, 392 S.C. 116, 122, 708 S.E.2d 766, 769 (2011). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), SCRCP; *Turner*, 392 S.C. at 766, 708 S.E.2d at 769.

"Determining the proper interpretation of a statute is a question of law, and this Court reviews questions of law de novo." *Perry v. Bullock*, 409 S.C. 137, 140, 761 S.E.2d 251, 252–53 (2014) (citation omitted).

### b. Section 15-73-10

Section 15-73-10 of the South Carolina Code provides that "[o]ne who sells any product in a defective condition unreasonably dangerous to **the user or consumer** . . . is subject to liability for physical harm caused to the ultimate user or consumer . . . ." S.C. Code Ann. § 15-73-10 (2005) (emphasis added).[12] This section imposes strict liability upon the manufacturer and seller of a product for an injury to any "user or consumer" if the product reaches the user or consumer without substantial change in the condition in which it is sold. *Id.*; *Fleming v. Borden, Inc.*, 316 S.C. 452, 457, 450 S.E.2d 589, 592 (1994).

---

[12] "This provision, which was adopted by the General Assembly in 1974, codified, nearly verbatim, Restatement (Second) of Torts § 402A." *In re Breast Implant Prod. Liab. Litig.*, 331 S.C. 540, 545, 503 S.E.2d 445, 447 (1998).

Section 15-73-10 does not define "user." Instead, the General Assembly expressly adopted the comments to section 402A of the Restatement of Torts (Second)—which discuss the meaning of "user"—as the expression of legislative intent for that section. *See* S.C. Code Ann. § 15-73-30 (2005) ("Comments to [section] 402A of the Restatement of Torts, Second, are incorporated herein by reference as the legislative intent of this chapter.").

Comment *l* to section 402A of the Restatement of Torts (Second), titled "User or consumer," provides in pertinent part:

> In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller, although the rule applies equally if he does so. He may have acquired it through one or more intermediate dealers. It is not even necessary that the consumer have purchased the product at all. He may be a member of the family of the final purchaser, **or his employee,** or a guest at his table, or a mere donee from the purchaser. The liability stated is one in tort, and does not require any contractual relation, or privity of contract, between the plaintiff and the defendant.
>
> . . .
>
> **"User" includes** those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes**, as well as those who are utilizing it for the purpose of doing work upon it,** as in the case of an employee of the ultimate buyer who is making repairs upon the automobile which he has purchased.

Restatement (Second) of Torts § 402A cmt. l (1965) (emphasis added).

Comment *o*, however, explains that in comment *l*, the American Law Institute (ALI) did not intend to express either approval or disapproval of expanding section 402A to allow recovery to those other than users or consumers. Comment *o* provides, in pertinent part:

> Thus far the courts, in applying the rule stated in this Section, have not gone beyond allowing recovery to users and consumers, as those terms are defined in Comment *l*. Casual bystanders, and others who may come in contact with the product, as in the case of employees of

the retailer, or a passer-by injured by an exploding bottle, or a pedestrian hit by an automobile, have been denied recovery.

Restatement (Second) of Torts § 402A cmt. o (emphasis added).

We have not yet applied the comments to section 402A to determine whether a plaintiff should be considered a "user" under section 15-73-10.  In fact, there has been only one occasion on which we have addressed the interpretation of the term "user" under section 15-73-10 for purposes of a strict liability claim.  *See Bray v. Marathon Corp.*, 356 S.C. 111, 116, 588 S.E.2d 93, 95 (2003).

In *Bray*, we found that an employee who suffered an emotional injury after watching a coworker being crushed by a trash compactor was a "user" of the trash compactor for purposes of section 15-73-10 because she was operating the controls of the defective trash compactor at the time of the accident.  356 S.C. at 116, 588 S.E.2d at 95.  Further, in line with comment *o*, we provided that a bystander analysis does not apply to a strict liability cause of action, stating that a "user of a defective product is not a mere bystander but a primary and direct victim of the product defect."  *Id.* at 117, 588 S.E.2d at 95.

The Lawings argue that Lawing was precisely the type of user for whom any warnings on the sodium bromate should have been intended, and therefore, the comments to section 402A support reversal of the trial court's decision on this issue.  We agree.

As an expert at trial testified, a product's labeling is considered part of the product's package.  *See also* Restatement (Second) of Torts § 402A cmt. h ("No reason is apparent for distinguishing between the product itself and the container in which it is supplied; and the two are purchased by the user or consumer as an integrated whole.").  The very purpose of warnings issued through labels on products is "to provide information to people about hazards and safety information they do not know about so they may avoid the product altogether or avoid the danger by careful use."  David G. Owen, *Products Liability Law* 621 (2d ed. 2008).  Indeed, labels and other aspects of packaging are typically a user's first line of defense in assessing a product's danger, and oftentimes, the only indication that a product is a highly flammable or otherwise dangerous product.

The fact that Lawing noticed the pallets of sodium bromate within the work area on the day of the fire—but failed to request their removal because he did not see a label indicating their dangerous nature—is crucial for purposes of

determining whether he should be considered a "user" of the sodium bromate. According to Lawing's testimony, he used the sodium bromate's labeling—or the lack thereof—to evaluate the safety of the product the day of the fire. Therefore, we find that Lawing's actions fall under comment *l* because Lawing used the information on the sodium bromate's packaging to complete work in close proximity to the pallets of sodium bromate, and to assess the need to avoid or move the nearby sodium bromate, regardless of the fact that he did not actually handle the sodium bromate.

Similar to the court of appeals, we find that Lawing was not a "casual bystander" with regard to the sodium bromate. *See Lawing*, 406 S.C. at 34, 749 S.E.2d at 137. On the day of the fire, there was the potential for Lawing to interact with the sodium bromate while completing his work in the refinery hall, especially after Engelhard employees failed to move the sodium bromate from the work area before the maintenance began. As the court of appeals stated, the examples set out in comment *o* "illustrate that the [ALI] intended that the people to be excluded from the definition of 'user' and 'consumer' are much farther removed from the product than Lawing and his co-workers were from the sodium bromate." *Id.*

### c. Court of Appeals' Definition of "User"

Although the court of appeals properly found that Lawing should be considered a "user" under section 15-73-10, we agree with Trinity and Matrix's contention that the court of appeals set forth far too broad a definition of "user" for purposes of a strict liability analysis in South Carolina.

After citing the comments to section 402A discussing the definition of "user," the court of appeals stated:

> **Considering the comments together, we believe the legislature intended that the term "user" include persons who could foreseeably come into contact with the dangerous nature of a product.** Thus, a person who examines a product for warnings and other safety information is one whom the seller intends will use that information to avoid the dangers associated with the product, and thus is a person who foreseeably could come into contact with its dangerous nature.

*Lawing*, 406 S.C at 34–35, 749 S.E.2d at 137 (emphasis added).

As evident from our application to Lawing in this case, we would not restrict the term "user" to plaintiffs who are injured while handling or operating the dangerous product. However, the court of appeals' expansive definition including as a "user" all "persons who could foreseeably come into contact with the dangerous nature of a product" could be interpreted as to allow a bystander employee to recover under section 15-73-10. As discussed, *supra*, *Bray* clearly prohibits bystander recovery for purposes of strict liability. *See Bray*, 356 S.C. at 117, 588 S.E.2d at 95. Furthermore, including a foreseeability analysis in a determination of whether a plaintiff constitutes a "user" under section 15-73-10 is improper. *See Bray*, 356 S.C. at 117, 588 S.E.2d at 96 ("Because [section] 15-73-10 limits liability to the user or consumer, there is no need for a limitation on foreseeable victims to avoid disproportionate liability as was found necessary in the bystander setting.").

A case-by-case analysis is more appropriate for courts' determination of who constitutes a "user" under section 15-73-10. Therefore, we hold that the court of appeals erred in setting forth its broad definition of "user," and affirm as modified the court of appeals' decision on this issue.

## II.   *Sophisticated User Jury Instruction*

The Lawings argue that the court of appeals erred in affirming the trial court's decision to charge the sophisticated user defense to the jury. We agree.

An appellate court will not reverse the trial court's decision regarding jury instructions unless the trial court committed an abuse of discretion. *Cole v. Raut*, 378 S.C. 398, 404, 663 S.E.2d 30, 33 (2008) (citing *Clark v. Cantrell*, 339 S.C. 369, 389, 529 S.E.2d 528, 539 (2000)). An abuse of discretion occurs when the trial court's ruling is based on an error of law or is not supported by the evidence. *Id.*

Suppliers and manufacturers of dangerous products are generally under a duty to warn the ultimate user of the dangers associated with the use of the product. *See Livingston v. Noland Corp.*, 293 S.C. 521, 525, 362 S.E.2d 16, 18 (1987) (citing *Gardner v. Q.H.S., Inc.*, 448 F.2d 238, 242 (4th Cir. 1971) (finding that the duty to warn arises when the user may not realize the potential danger of a product)). However, the sophisticated user doctrine, which arose from comment *n* to section 388 of the Restatement (Second) of Torts,[13] recognizes that a supplier

---

[13] Section 388 provides that one who supplies a chattel directly or through a third

may rely on an intermediary to provide warnings to the ultimate user if the reliance is reasonable under the circumstances. *See* Restatement (Second) of Torts § 388 cmt. n. The sophisticated user doctrine is typically applied as a defense to relieve the supplier of liability for failure to warn where it is difficult or even impossible for the supplier to meet its duty to warn the end user of the dangers associated with the use of a product, and the supplier therefore relies on the intermediary or employer to warn the end user. *See id.*

In arguing that the court of appeals erred in affirming the trial court's decision to charge the jury on the sophisticated user defense, the Lawings contend that the sophisticated user defense is not the law of South Carolina. We agree that prior to the court of appeals' opinion in this case, neither this Court, nor the court of appeals, had explicitly adopted the defense.[14] However, we need not formally

---

person a chattel for another to use is subject to liability for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier: (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous. Restatement (Second) of Torts § 388 (1965).

[14] The court of appeals stated in its opinion that when it affirmed a trial court's decision to charge the jury on the sophisticated user defense in *Bragg v. Hi-Ranger, Inc.*, 319 S.C. 531, 462 S.E.2d 321 (1995), the court "recognized that the sophisticated user doctrine is part of the products liability law of South Carolina." *Lawing*, 406 S.C. at 23, 749 S.E.2d at 131. In affirming the jury charge in *Bragg*, however, the court of appeals referenced section 388 of the Restatement (Second) of Torts—upon which the sophisticated user doctrine is based—but did not state whether South Carolina courts had adopted that section. *Bragg*, 319 S.C. at 550, 462 S.E.2d at 332 ("The sophisticated user defense outlined in section 388 of the Restatement (Second) of Torts has been adopted by numerous jurisdictions."). We note that the only mention of section 388 from this Court—albeit not in the context of whether the sophisticated user defense is a viable one—was in a dissent in *Claytor v. General Motors Corporation*, 277 S.C. 259, 267, 286 S.E.2d 129, 133 (1982) (Lewis, C.J., dissenting). Further, although the court in *Bragg* found that the jury's charge was an "accurate recitation" of the sophisticated user doctrine as "adopted by a majority of jurisdictions," it did not provide that the sophisticated

adopt the doctrine at this time because as discussed, *infra*, the facts of this case do not implicate the sophisticated user defense.[15]

When instructing the jury, the trial court is required to charge only principles of law that apply to the issues raised in the pleadings and developed by the evidence in support of those issues. *Clark*, 339 S.C. at 390, 529 S.E.2d at 539 (citing *Tucker v. Reynolds*, 268 S.C. 330, 335, 233 S.E.2d 402, 404 (1977)). Accordingly, the threshold question in determining whether the trial judge erred in charging the sophisticated user defense to the jury is whether the law was implicated by the evidence in this case. We find that it was not, and therefore hold that the trial court erred in charging the sophisticated user defense.

Trinity and Matrix—similar to the court of appeals—center their argument around Engelhard's knowledge of the nature and use of sodium bromate, an unsurprising approach given that the sophisticated user defense revolves around an intermediary's knowledge and awareness of the danger associated with the use of a particular product. *See Lawing*, 406 S.C. at 30–32, 749 S.E.2d at 135–36. Indeed, based on the testimony in this case, there is no doubt that Engelhard was very familiar with sodium bromate and understood its dangerous nature.

However, a sophisticated user has a responsibility separate and apart from the responsibility to adequately label a dangerous product. Under the specific factual circumstances in this case, the proper focus is the *labeling* on the sodium bromate shipped to Engelhard, not the *use* of sodium bromate in Engelhard's plant. Engelhard's knowledge of the dangers of sodium bromate does not affect the

---

user defense was in fact the law of South Carolina. *See Bragg*, 319 S.C. at 550–51, 462 S.E.2d at 332.

[15] Likewise, to the extent that the Lawings contest the correctness of the trial court's sophisticated user defense jury charge—which took a common law approach to the doctrine, as opposed to the Restatement approach—we do not address that issue. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding that the Court need not address remaining issues when resolution of a prior issue is dispositive).

suppliers' duty to properly label sodium bromate as a hazardous and flammable product, because the knowledge of sodium bromate's inherent qualities are useless to a person who comes into contact with the chemical but cannot identify it.[16]

In other words, there is a critical distinction between an intermediary's knowledge of the dangerous qualities and nature of a product, and the ability of the third party user to identify and recognize that product on its face. When considering only Engelhard's use of sodium bromate in its manufacturing process, it follows that Engelhard is a "sophisticated user." However, when, as here, labeling is the underlying issue, the adequacy of the labeling on the sodium bromate does not require a sophisticated user analysis. If we conflate the two analyses—as the dissent would have us do—we would absolutely absolve suppliers of their responsibility to label dangerous products during shipment and upon delivery. The fact that a sophisticated user of a particular product ultimately receives the product does not permit the supplier to decide whether or not to adequately label the dangerous product as such.

Black testified that employees like himself utilized labeling on products as their "first line of defense" within the plant. Because maintenance workers, including Lawing, received training to familiarize themselves with hazard labels, i.e., the oxidizer symbol, with no visible hazard label, these employees who encountered the shrink-wrapped pallets of sodium bromate were unable to identify it as a dangerous product. Under these facts, Engelhard's knowledge regarding the properties of sodium bromate and its transfer of that information to its employees is insignificant.

Therefore, we find that the evidence does not support a jury charge on the sophisticated user defense because the evidence in this case that *does* support that charge—i.e., Engelhard's experience with sodium bromate, the fact that it employed chemical engineers, and the MSDSs which were available—is merely a distraction from the real issue: the visibility of the labels indicating danger on the pallets of sodium bromate. Accordingly, the trial court abused its discretion in charging the sophisticated user defense to the jury, and we reverse the court of appeals' decision on this issue.

---

[16] The trial court apparently had a similar concern while hearing pre-trial motions, as it asked counsel, "How is a sophisticated user like Engelhard and their employees going to know the stuff is what it is unless it is properly labeled?"

## CONCLUSION

Based on the foregoing, we affirm the court of appeals' decision reversing the trial court's grant of summary judgment to Trinity and Matrix on the Lawings' strict liability claim, but in doing so, modify the definition of "user" set forth by the court of appeals for purposes of section 15-73-10.

Further, because the evidence in this case does not support the sophisticated user defense, we find that trial court erred in charging the defense to the jury. Accordingly, we reverse the court of appeals' decision affirming the jury charge, and remand the Lawings' negligence and implied warranty of merchantability claims for a new trial.

**BEATTY and HEARN, JJ., concur.  KITTREDGE, J., concurring in part and dissenting in part in a separate opinion.  PLEICONES, J., dissenting in a separate opinion.**

**JUSTICE KITTREDGE**:  I concur in part and respectfully dissent in part.  I join the majority in its construction of the term "user" for purposes of section 15-73-10 of the South Carolina Code (2005).  I dissent with respect to the "sophisticated user" doctrine and would adopt what I believe to be the excellent analysis of the court of appeals concerning the doctrine and its application to this case.

I offer two additional comments.  First, I do not agree with the majority "that prior to the court of appeals' opinion in this case, neither this Court, nor the court of appeals, had explicitly adopted the [sophisticated user] defense."  The doctrine was clearly recognized in *Bragg v. Hi-Ranger, Inc.*, 319 S.C. 531, 550, 462 S.E.2d 321, 332 (Ct. App. 1995), when the court of appeals "conclude[d] the trial court properly charged the jury concerning the sophisticated user defense." Nevertheless, I would modify *Bragg* in one respect.  The jury charge approved in *Bragg* instructed the jury that manufacturers have no duty to warn of risks associated with a product when the product is to be distributed to a "learned intermediary" or sophisticated user.  *Id.* at 549, 462 S.E.2d at 331.  A similar charge was given in this case.  *See Lawing v. Trinity Mfg., Inc.*, 406 S.C. 13, 32, 749 S.E.2d 126, 136 (Ct. App. 2013).  However, contrary to the jury charges in *Bragg* and in this case, the sophisticated user doctrine does not negate the existence of a duty on the part of the manufacturer.  As the court of appeals correctly observed, "the sophisticated user doctrine does not operate to defeat any duty.  It simply identifies circumstances the jury must consider when determining whether the supplier's duty to warn was breached."[17]  *Id.* at 28, 749 S.E.2d at 133.

Second, I would not avoid the issue of the sophisticated user doctrine's existence and applicability by creating a distinction between the labeling and the use of the sodium bromate, as if the two are not related.  I view the issues of labeling and use as inextricably connected in this case.  It is undisputed that Trinity Manufacturing and Matrix Outsourcing knew that Engelhard employees would be in close proximity to the sodium bromate, working with or around the dangerous product. While acknowledging "Engelhard was very familiar with sodium bromate and

---

[17]  The court of appeals did not address, and properly so in my judgment, the effect of this erroneous jury instruction in this case because it was not preserved for appellate review.  *Id.* at 32, 749 S.E.2d at 136.

understood its dangerous nature," the Court states that "Engelhard's knowledge of the dangers of sodium bromate does not affect the suppliers' duty to properly label sodium bromate as a hazardous and flammable product." I believe Engelhard's knowledge of the dangers of sodium bromate is at the heart of the sophisticated user defense. Engelhard's knowledge of those dangers is a critical factor in assessing "'whether the supplier . . . acted reasonably in assuming that the intermediary would recognize the danger and take precautions to protect its employees.'" *Bragg*, 319 S.C. at 550, 462 S.E.2d at 332 (quoting *O'Neal v. Celanese Corp.*, 10 F.3d 249, 253 n.2 (4th Cir. 1993)). Again, I refer to the court of appeals' opinion:

> Considered as a whole, this evidence supports the trial court's decision to charge the jury on the sophisticated user doctrine. It shows Trinity and Matrix knew Engelhard used large quantities of sodium bromate and had tested samples of the product in its laboratory before deciding to buy it. It also shows that employees of Matrix, a wholly-owned subsidiary of Trinity, and Univar, the company to which Trinity directly sold the sodium bromate, believed Engelhard had a safety program that ensured employees were adequately informed of the dangers of the chemicals in the facility. Finally, it shows Trinity and Matrix knew about the MSDS and that Engelhard received it. A jury could infer from this evidence that Trinity and Matrix acted reasonably in providing warnings on the bags and in the MSDS, relying on Engelhard to provide its employees any additional warnings about the dangers of sodium bromate.

*Lawing*, 406 S.C. at 31–32, 749 S.E.2d at 135–36. I would affirm the court of appeals with respect to the sophisticated user doctrine.

**JUSTICE PLEICONES:**  I respectfully dissent.  I agree with Justice Kittredge that the Court of Appeals properly decided the "sophisticated user" issue, and that the doctrine has been part of South Carolina's jurisprudence since 1995.  I disagree with the majority, with Justice Kittredge, and with the Court of Appeals, however, on the question whether Lawing was a 'user' within the meaning of S.C. Code Ann. § 15-73-10 (2005), and would therefore uphold the trial court's decision to grant summary judgment to Trinity and Matrix on Lawing's strict liability claim.

Section 15-73-10 imposes strict liability on sellers to users and consumers under certain circumstances.  The meaning of the terms "user" and" consumer" are elucidated by the Comments to § 402A of the Restatement of Torts Second.[18]  Comment l provides: ""User" includes those who are passively enjoying the benefit of the product . . . as well as those who are utilizing it for the purpose of doing work upon it . . . ."  At the time of this horrific accident, the sodium bromate was being stored, albeit in an improper location, "until it was needed for production."  *Lawing v. Univar, USA, Inc.*, *supra* at p. _____.  Moreover, the accident occurred during "shutdown week" when no "regular production" took place.  *Id.*  Given these circumstances, I would find that Lawing was not a 'user' within the meaning of § 15-73-10 when the fire occurred, because at that juncture neither he nor Engelhard was "utilizing [the sodium bromate] for the purpose of doing work upon it" within the meaning or contemplation of Comment l.

This is a tragic case, but for the reasons given above, I respectfully dissent, and would affirm the Court of Appeals on the "sophisticated user" issue, and reverse that court on the "user within the meaning of § 15-73-10" issue and reinstate the trial court's order granting summary judgment to Trinity and Matrix.

---

[18] Pursuant to S.C. Code Ann. § 15-73-30 (2005), these comments are incorporated by reference and are deemed to express the General Assembly's legislative intent.